## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| JAMES ALLEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) CAUSE NO.: |
| CITY OF CHICAGO, | ) JURY TRIAL DEMANDED |
| Special Representative of the Estate of | ) |
| Former Chicago Police Detective | ) |
| MICHAEL POCHORDO, deceased, | ) |
| Special Representative of the Estate of | ) |
| Former Chicago Police Detective | ) |
| GEORGE ROTKVICH, JR., deceased, | ) |
| and Former Chicago Police | ) |
| Sergeant JOHN E. TOENINGS, | ) |
| | ) |
| Defendants. | ) |

## <u>COMPLAINT</u>

Comes now, Plaintiff, JAMES ALLEN, by counsel, **MIDWEST INJURY LAWYERS, LLC**, **SAM ADAM, JR. LAW GROUP**, and **JON ERICKSON, ESQ.**, and for his Complaint against Defendants, CITY OF CHICAGO, Special Representative of the Estate of Former Chicago Police Detective MICHAEL POCHORDO, deceased (Star No. 14482); Special Representative of the Estate of Former Chicago Police Detective GEORGE ROTKVICH, JR. (Star No. 13479), and Former Chicago Police Sergeant JOHN E. TOENINGS (Star No. 1459) (hereinafter and collectively, "Defendants"), respectfully states as follows:

## I.    INTRODUCTION

1.    This is a civil rights action brought pursuant to 42 U.S.C. §1983, 42 U.S.C. §1988 and Illinois state law to address deprivations under the color of law of the Plaintiff, James Allen's (hereinafter, "Plaintiff") rights secured by the United States Constitution.

2.    On August 28, 1987, Plaintiff was wrongfully convicted of armed robbery and murder relating to the August 1, 1984 death of Robert Ciralsky, Sr. (hereinafter, "Ciralsky").[1] He was convicted after the Defendants manipulated witnesses and suspects, fabricated evidence, used unconstitutional and coercive interrogation techniques to obtain a false confession from Plaintiff, and withheld exculpatory evidence that would have demonstrated his absolute innocence of these crimes.

3.    On September 22, 1987, Plaintiff was sentenced to natural life for murder and 40 years imprisonment for armed robbery, which were to be served concurrently. To date, Plaintiff has served nearly 35 years for this armed robbery and murder that he unequivocally did not commit.

4.    Included among the fabricated evidence was an involuntary confession attributed to Plaintiff, which was concocted and coerced by Defendants after threatening Plaintiff with the death penalty as well as offering monetary inducements and physical protection. Additionally, Defendants fed Plaintiff, witnesses and other suspects details of the August 1, 1984 murder, which were clearly false and offered to support the Defendants' theory of the case. Moreover, Defendants utilized coercive and

---

[1] Plaintiff was also convicted of conspiracy; however, this conviction was vacated by the Appellate Court of Illinois-First District. *See People v. Allen*, 221 Ill.App.3d 737 (1st Dist. 1991).

unconstitutional methods to compel Plaintiff and others to falsely testify about their and others' involvement in the Ciralsky case to a Cook County Grand Jury.

5.      Defendants heavily relied on Darryl Moore (hereinafter, "Moore"), a career criminal and jailhouse snitch with a reputation for untruthfulness and unreliability, to pin these crimes on Plaintiff. Specifically, Former Chicago Police Detective MICHAEL POCHORDO, deceased (Star No. 14482) (hereinafter, "Pochordo") entirely relied on Moore in his investigation of the Ciralsky case and to "identify" Plaintiff as one of the perpetrators of the crime. Furthermore, at the direction of Pochordo, Moore falsely implicated Plaintiff as one of the contract killers hired to murder Ciralsky in his grand jury testimony. Moore later recanted this testimony and testified, *inter alia*, that Pochordo provided him with Plaintiff's false confession and instructed him to testify consistent with the false confession at the grand jury in exchange for pay. Pochordo engaged in similar conduct with other grand jury witnesses in this case, *e.g.*, provided witnesses with transcripts of other grand jury witnesses to ensure that the false narrative was consistent, threatened physical abuse if the grand jury testimony offered was not consistent with the false narrative he created, improperly coached witnesses to offer false testimony under oath, and offered inducements and benefits in exchange for patently false testimony.

6.      As a result of the Defendants' misconduct, Plaintiff was wrongfully prosecuted and convicted of armed robbery and murder.

7.      After several years of Plaintiff maintaining his actual innocence and fighting for his exoneration, Robert Langford (hereinafter, "Langford") confessed that he, in fact, robbed and murdered Ciralsky, and that Plaintiff was innocent and had nothing

to do with the murder. Langford also revealed that another "James Allen" known as "Mr. Kirby," "Kirby," and "Z(S)ircon" (hereinafter, "Kirby") was his accomplice in the Ciralsky armed robbery and murder. Langford further admitted that he murdered Kirby because Kirby was acting as a Chicago Police Department (hereinafter, "CPD") informant and identified Langford to CPD as the perpetrator of the Ciralsky robbery and murder.

8.     On September 15, 2021, Plaintiff's conviction was vacated, the charges were dismissed, and he was finally exonerated of these crimes.

9.     Plaintiff now seeks justice for the harm that the Defendants have caused and redress for the loss of liberty and the terrible hardship that he has endured and continues to suffer as a result of Defendants' misconduct.

## II.     JURISDICTION AND VENUE

10.     This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the United States Constitution.

11.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over his state law claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in the judicial district. The events giving rise to this Complaint occurred in this judicial district and in the Eastern Division of this Court.

### III.    PARTIES

13.    Plaintiff is a 72-year-old Black man who is an inmate at Pontiac Correctional Center in Pontiac, Illinois.[2] Plaintiff is known by the nickname "Head."

14.    The Special Representative of the Estate of Michael Pochordo is named as a Defendant in his/her capacity as Special Representative of Pochordo's estate, to defend Pochordo in this action. At all relevant times, Pochordo (Star No. 14482) was a white detective with the CPD and acted under the color of law and within the scope of his employment with Defendant, City of Chicago.

15.    The Special Representative of the Estate of George Rotkvich, Jr. (hereinafter, "Rotkvich") is named as a Defendant in his/her capacity as Special Representative of Rotkvich's estate, to defend Rotkvich in this action. At all relevant times, Rotkivich (Star No. 13479) was a white detective with the CPD and acted under the color of law and within the scope of his employment with Defendant, City of Chicago.

16.    At all relevant times, Defendant, John E. Toenings (hereinafter, "Toenings") (Star No. 1459) was a white sergeant with the CPD, Pochoardo's supervisor, and acted under the color of law and within the scope of his employment with Defendant, City of Chicago.[3]

---

[2] Note: Plaintiff is still serving a life sentence for the June 21, 1984 murder of Carl Gibson, which was also primarily investigated by Pochordo with the assistance of Moore, and is currently subject to post-conviction relief proceedings. The convictions relating to this June 21, 1984 murder triggered a parole violation charge for a 1969 murder Plaintiff was convicted of and ultimately granted parole for in 1983.

[3] Note: As used within this Complaint, "Police Officer Defendants" shall refer to Pochordo, Rotkvich and Toenings collectively.

17.     Defendant, City of Chicago (hereinafter, "The City") is a municipality incorporated under the laws of the State of Illinois, and it operates the CPD. The City employed Defendants as well as as-yet unknown CPD officers, detectives or command staff.

## IV.     FACTUAL BACKGROUND

### A. *The August 1, 1984, Murder of Ciralsky*

18.     Around 10 p.m. on August 1, 1984, Ciralsky closed his liquor and grocery store for the night.

19.     As he exited his store, Ciralsky stopped to talk to a police officer he knew in the neighborhood. He then got in his car and drove home, located at 4820 S. Kimbark in Chicago, Illinois, where his wife, Paula Ciralsky (hereinafter, "Paula") and son, Robert Ciralsky Jr. (hereinafter, "Robert, Jr."), were waiting for him.

20.     As Ciralsky parked the car and started to get out, he was attacked.

21.      During this attack, Ciralsky was shot once in the shoulder and once in the forehead.

22.     The disturbance drew Paula and Robert, Jr. to the window. Robert, Jr. yelled at two men he saw standing near Ciralsky's car and, seeing the flash of a shiny object in one man's hand, fired one shot at them with a handgun.

23.     Upon hearing the shot fired by Ciralsky, Jr., the two assailants fled.

24.     After the two suspects fled, Robert, Jr. and Paula approached Ciralsky's car and found Ciralsky sprawled across the front seat. Ciralsky's pants pocket was ripped open, and his belongings were scattered.

25.     Police and an ambulance arrived shortly thereafter. Efforts to revive Ciralsky failed.

**B. *The Initial Investigation***

26.     CPD personnel arrived at the crime scene and interviewed several witnesses, including Paula and Robert, Jr.

27.     On the night of the occurrence, Robert, Jr. provided a general description of the alleged assailants. He described them as two individuals, the first one being slender, dark complected, under 30 years old, and wearing beige pants with a yellow or light brown coat or windbreaker; and the second as under 30 years old and heavier than the other individual.

28.     The case ultimately went cold and there were no further substantive developments until November 1985.

29.     In late November 1985, Pochordo testified that he received a telephone call regarding Ciralsky's murder. According to Pochordo, the anonymous caller told him that if he wanted to solve Ciralsky's murder, he should look to the people who had committed the murder of Carl Gibson.

30.     Pochordo had investigated Carl Gibson's murder, and Plaintiff was one of several people convicted of murder for Carl Gibson's death.[4] Pochordo was already familiar with Plaintiff and Moore from investigating Gibson's murder. In that case,

---

[4] Note: Plaintiff has pending actual innocence and constitutional claims relating to the Carl Gibson case.

Pochordo fed a narrative to Moore and falsified an affidavit regarding the nature and extent of his relationship with Moore.

31.     Pochordo claimed that Moore provided him with several details regarding the Ciralsky murder, including that Moore had arranged the contract killing of Ciralsky due to Ciralsky's refusal to continue supplying Quinine[5]; that Plaintiff had followed Ciralsky the night of his murder; and that two other men, Franklin Freeman (hereinafter, "Freeman") and Henry Griffin (hereinafter, "Griffin"), got out of Plaintiff's car to murder Ciralsky.

### C.  December 9, 1985 Interrogation of Plaintiff

32.     On December 9, 1985, Pochordo and Rotkvich conducted an interrogation of Plaintiff at Stateville Correctional Center (hereinafter, "Stateville") regarding Ciralsky's murder.

33.     Pochordo, Rotkvich and Plaintiff were the only individuals present during this interrogation.

34.     Neither Pochordo nor Rotkvich took any written or recorded statements from Plaintiff during or relating to the December 9, 1985 interrogation. Additionally, there was no court reporter present for this interrogation. The only record of the interrogation were Pochordo's notes in the General Progress Report, which were not signed off as received by a CPD supervisor.

---

[5] Note: Quinine is a commonly utilized cutting agent to dilute the purity of heroin.

35.    During this interrogation, Pochordo told Plaintiff he had certain information linking him to Ciralsky's murder.

36.    Pochordo told Plaintiff that an informant had implicated Plaintiff in the contract murder of Ciralsky on behalf of two drug dealers, Charles Ashley (hereinafter, "Ashley") and Willie "Flukey" Stokes (hereinafter, "Stokes").

37.    Pochordo told Plaintiff that he had information that Ashley and Stokes solicited Ciralsky's murder because Ciralsky had cut back on sales of Quinine to drug dealers on the south side of Chicago.

38.    The evidence heard at trial conflicted with what happened next in that December 9, 1985 meeting. Pochordo testified that Plaintiff told him his information was "basically correct," but that Plaintiff would have to think about his family's safety and his own safety before agreeing to cooperate with the investigation. Nonetheless, Pochordo testified that Plaintiff provided the name of two additional drug dealers who had solicited Ciralsky's murder, Harry Scott (hereinafter, "Scott") and Prentiss King (hereinafter, "King") during the December 9, 1985 interrogation. Plaintiff, however, testified that he gave Pochordo no information on that date. Instead, Plaintiff testified that he told Pochordo and Rotkivich that he knew nothing about the crime and denied any involvement.

### D. December 19, 1985 Interrogation of Plaintiff and his Coerced Confession

39.    On or about December 19, 1985, Pochordo returned to Stateville to conduct a second interrogation of Plaintiff with a currently unnamed Cook County Assistant

State's Attorney (hereinafter, "Prosecutor A") and a currently unnamed investigator from Cook County State's Attorney's Office Gang Unit (hereinafter, "Investigator A").

40.     Initially, Plaintiff did not make any statements and refused to cooperate. Pochordo then asked Prosecutor A and Investigator A to leave the room, which they did.

41.     While Prosecutor A and Investigator A were absent from the room, Pochordo told Plaintiff that this was "his opportunity to help himself" and "avoid another conviction which [he] might receive the death penalty and go to death row." Pochordo told Plaintiff that all he had to do was "tell the truth." When Plaintiff asked what the truth was, Pochordo responded that it was the false narrative Pochordo told him during the December 9, 1985 interrogation. (*See infra*, ¶31).

42.     Under intense duress and coercion due to Pochordo's threat of a death sentence, Plaintiff implicated himself in the murder of Ciralsky and corroborated the false details provided to him by Pochordo to Prosecutor A.

### E. Interrogations of Freeman

43.     On or about December 16, 1985, Pochordo and Prosecutor A drove to Rockford, Illinois to interrogate Freeman who, at the time, was in custody on unrelated matters.

44.     During this December 16, 1985 interrogation, Pochordo told Freeman that he had information that he was involved in the murder of Ciralsky. Pochordo reported that Freeman asked who the source of the information was, which Pochordo said he declined to provide. Pochordo testified that Feeman stated he "[had] a pretty good idea

of who the source is, but just can't talk about it now because the type of people involved in this aren't the type of people you can just talk on." The interrogation then ended.

45.     On or about December 23, 1985, Pochordo, Investigator A and Prosecutor A returned to Rockford to re-interview Freeman.  It was requested that Freeman undergo a polygraph examination, which correctly concluded that Freeman was not present for the crime, but incorrectly indicated that Freeman had knowledge of the crime. Notwithstanding the results, Pochordo, Investigator A, and Prosecutor A told Freeman that the polygraph exam revealed he was lying about having participated in the murder of Ciralsky.

46.     On or about December 30, 1985, Pochordo and Prosecutor A returned to Rockford to interview Freeman for a third time. This time, Pochordo and Prosecutor A brought Moore with them to try to convince Freeman to cooperate.

47.     During the pretrial proceedings, it was revealed that Pochordo and Prosecutor A promised Moore $5,000.00-$10,000.00 to travel with them to Rockford to get Freeman to cooperate and support their false narrative regarding the Ciralsky robbery and murder, i.e., Moore had arranged the contract killing of Ciralsky due to his refusal to continue supplying Quinine and that Freeman, Griffin and Plaintiff murdered Ciralsky on the orders of Stokes, King and Scott.

48.     Pochordo and Prosecutor A fed Moore the fabricated narrative of the case to convey to Freeman during the car ride from Chicago to Rockford. They also showed Moore pictures of individuals he was to convince Freeman to implicate in the crime (Plaintiff, Stokes, Ashley, Scott and King).

49.     Despite Moore's protests as to the falsity of the narrative being provided to him, he was directed by Pochordo and Prosecutor A to stick with the story they provided.

50.     Upon arriving at the interrogation site, Pochordo and Prosecutor A left Moore and Freeman alone in a room for approximately 45 minutes, where Moore conveyed to Freeman the fabricated story provided by Pochordo and Prosecutor A. Ultimately, Moore convinced Freeman to cooperate and testify at the grand jury.

51.     Pochordo and Prosecutor A then provided Freeman with photographs and information to study for his grand jury appearance.

### F.   The Grand Jury

52.     Plaintiff agreed to testify at the grand jury against the other individuals Pochordo said were involved in the plot and to plead guilty to Ciralsky's murder.  In return, the State would seek a life sentence to run concurrently with the life sentence he was already serving for the murder of Carl Gibson.

53.     In addition to sentencing leniency, arrangements were made to transfer Plaintiff to the Metropolitan Correctional Center from Stateville for his protection because a bounty had been placed on his life due to the perception that he was cooperating with law enforcement.

54.     Plaintiff was also provided financial consideration in exchange for his cooperation.

55.     Moore and Freeman testified prior to the Plaintiff.

56.     Prior to Freeman testifying, he was physically threatened by Pochordo during the car ride from Rockford to Chicago.

57.     Pochordo and Prosecutor A provided Freeman with photographs and specific testimony to offer at the grand jury.

58.     Prior to Plaintiff's testimony before the grand jury, Pochordo provided Plaintiff with transcripts of Moore and Franklin's grand jury testimony.

59.     Plaintiff testified before the grand jury on February 9, 1986.

60.     Freeman was also offered inducements to provide false testimony, including dismissal of then-pending criminal charges in Winnebago County, Illinois and housing in protective custody.

61.     Moore, Freeman and Plaintiff's grand jury testimony were essentially the same fabricated narrative concocted by the Police Officer Defendants, Investigator A, and Prosecutor A: three drug dealers (Stokes, King and Scott) hired Plaintiff, Freeman, and Griffin to kill Ciralsky for cutting back on Quinine sales; and the murder was to look like an armed robbery carried out at Ciralsky's home, so as to conceal the fact that it was really a contracted, drug-related murder connected to his business.

62.     On February 11, 1986, Plaintiff, Stokes, Freeman, King, Scott and Griffin were indicted for the murder of Ciralsky and related charges.

### G. Moore's Recantation, Moore's Unreliability and Pochordo's Pattern of Fabrication Revealed

63.     In August 1986, Moore testified in pretrial proceedings and recanted his grand jury testimony offered against Stokes, Griffin, King, and Scott for the armed robbery and murder of Ciralsky.

64.     On August 18, 1986, the charges against Stokes, King, Scott, and Griffin were dismissed, due in part to Moore's recantation.

65.     Following Moore's recantation in the Ciralsky case, Plaintiff and Freeman also recanted their respective grand jury testimony as false and procured through undue coercion by the Police Officer Defendants. Plaintiff also withdrew from a deal to testify for the State in exchange for protection and a concurrent life sentence.

66.     On August 19, 1986, and following his testimony in the pretrial proceedings that resulted in dismissals against Griffin, Stokes, King, and Scott in the Ciralsky case, Moore gave a videorecorded statement to Attorney Sam Adam, Sr. relating to his testimony in the Carl Gibson case.

67.     During that August 19, 1986 statement, Moore revealed that he lied under oath and recanted his testimony implicating Plaintiff in the Carl Gibson murder. Specifically, he stated that everything he said on the stand was a lie. Moore further revealed that Pochordo "told [him] basically everything to say."

68.     Moore also admitted that the information in Pochordo's sworn affidavit used to arrest Plaintiff for the Carl Gibson murder, which cited him as a reliable source, was "totally false."

69.     Pochordo attested in the probable cause affidavit in the Carl Gibson case that Moore had assisted in ten murder cases that resulted in ten arrests, six convictions, an acquittal and two other unknown outcomes. Ultimately, this attestation was proven to be completely fabricated. Moore also testified that the attestation was false. In fact, the

Carl Gibson and Ciralsky murders were the only matters in which Moore operated as an informant to Pochordo.

70. Moore admittedly provided false testimony in the Carl Gibson case at the behest of Pochordo, in exchange for criminal case dismissals, a plea deal for a time-served sentence on an armed robbery case, and cash.

71. In a 2002 *habeas corpus* proceeding for Griffin's incarceration in the Carl Gibson matter, Moore revealed that everything he "knew" from the Carl Gibson case was fed to him by Pochordo. Moore reaffirmed his prior recantations in that case.

72. In September 1986, Moore testified in pretrial proceedings for the Ciralsky case. During that testimony, Moore recanted substantial portions of his grand jury testimony regarding the Ciralsky murder and offered testimony proving Pochordo's sworn testimony in that case was false, *e.g.*:

    a. Contrary to Pochordo's account of Moore providing him information regarding the murder when first contacted, Moore testified that when asked about the murder by Pochordo, Moore told him that he had "no knowledge of it at all," and, in fact, Pochordo fed him information allegedly received from Lucy Kemper that Plaintiff was involved in the murder.

    b. Recanted grand jury testimony that a murder-for-hire contract was placed on Ciralsky by Ashley and Stokes due to Ciralsky's refusal to continue supplying Quinine to their operations;

    c. Recanted his grand jury testimony that he set up a meeting between himself, Plaintiff, Ashley and Griffin to make arrangements for the contract killing of Ciralsky;

    d. Recanted his grand jury testimony that he suggested to Ashley that Freeman be the third person to assist in the contract killing of Ciralsky;

    e. Recanted his grand jury testimony that he suggested to Ashley that Plaintiff and Griffin perform the murder-for-hire contract on Ciralsky;

- 15 -

f.  Recanted his grand jury testimony that he got into contact with Plaintiff, Griffin, and Freeman after he met with Ashley and Stokes regarding the murder-for-hire contract on Ciralsky;

g.  Recanted his grand jury testimony that he told Plaintiff, Freeman, and Griffin about the murder-for-hire contract and that they accepted;

h.  Recanted his grand jury testimony that he set up a pre-hit meeting between Ashley, Stokes, King, Scott, Griffin, and Freeman at Griffin's residence;

i.  Recanted his grand jury testimony that he was aware on August 1, 1984 that Robert Ciralsky was murdered;

j.  Recanted his grand jury testimony that Griffin confirmed the success of the alleged contracted killing of Ciralsky;

k.  Admitted that Pochordo and Prosecutor A showed him purported statements of Griffin and Plaintiff and that was the only basis of his knowledge that Griffin and Plaintiff were involved in Ciralsky's murder;

73.  In 2002, it was revealed that Moore received more than $65,000 in bribes from the CPD and Cook County State's Attorney's Office in exchange for testimony in the Gibson and Ciralsky cases. However, this financial arrangement was not disclosed to Plaintiff nor his counsel before or during either trial.

### H. The Ciralsky Trial

74.  Plaintiff's trial in the Ciralsky case took place in late August 1987.

75.  By late 1985, and prior to Plaintiff's trial for the Ciralsky robbery and murder, Pochordo and Prosecutor A had actual knowledge of another murder confession in the Ciralsky case. Pochordo and Prosecutor A knew that "Kirby," the other individual with the legal name James Allen, had already confessed to the Ciralsky murder, and

identified Robert Langford as an accomplice. Pochordo and Prosecutor A knowingly withheld that information from Plaintiff's attorneys.

76.     There was no physical evidence that linked Plaintiff to the crime.

77.     The only witness to the occurrence to testify was Ciralsky's son, Robert Jr., who came to the window after his father had already been shot. He was unable to make an identification of any perpetrators at the scene. Robert, Jr. specifically testified that he never identified Plaintiff as the individual he saw on the night of the Ciralsky murder, directly contradicting Pochordo's testimony that Robert, Jr. tentatively identified Plaintiff as being at the crime scene.

78.     At trial, Plaintiff adamantly disavowed his grand jury testimony. Testifying in his own defense, Plaintiff indicated that he simply repeated the story Pochordo had told him, first to Prosecutor A and then to the grand jury.

79.     On August 28, 1987, Plaintiff was convicted of murder, armed robbery, and conspiracy. He was subsequently sentenced to natural life plus 40 years.

80.     Plaintiff's conviction wholly rested on the testimony of Pochordo and Prosecutor A, Plaintiff's coerced and false confession, and false grand jury testimony provided to Plaintiff by Pochordo and Prosecutor A.

### I.   *Robert Langford Comes Forward*

81.     Between 2009 and 2017, Robert Langford executed four affidavits that were utilized in Plaintiff's post-conviction relief proceedings.

82.     In his first notarized affidavit dated January 28, 2010, Langford stated that he and a deceased accomplice followed Ciralsky on the night of August 1, 1984 and

confronted him outside of his home. He further stated that when Ciralsky was ordered to empty his pockets, Ciralsky refused and Langford shot him. He proceeded to take money from Ciralsky's pocket. He also indicated that someone inside of the Ciralsky home fired a shot, prompting him and his accomplice to flee by car. The affidavit went on to state that "James Allen is innocent of the Robert Ciralsky murder."

83.     Langford executed a second affidavit on August 19, 2016 that reaffirmed Plaintiff's innocence. The affidavit stated that an overweight detective from Area One Violent Crimes District (who Langford has since identified as Pochordo) and a stocky-built assistant State's Attorney (who Langford has since identified as Prosecutor A) who walked with a limp knew Plaintiff was innocent, because prior to Plaintiff's arrest for the Ciralsky murder, Langford's accomplice in the Ciralsky murder, "Mr. Kirby," told Westside detectives that on the evening of August 1, 1984, hours prior to the robbery and murder of Ciralsky, Langford robbed and shot a man twice on California and Monroe with the same gun he used to murder Ciralsky.

84.     Langford executed a third affidavit on July 24, 2018 that revealed the identity of Langford's accomplice. In the affidavit, Langford cited his August 19, 2016 affidavit wherein he identified his accomplice as "Mr. Kirby." Langford clarified that his accomplice was nicknamed "Kirby" and that he also went by the name "Z(S)ircon." Langford stated:

> Kirby's real name was James Allen. Kirby gave up my name to the authorities in connection with the murder of Robert Ciralsky. Afterwards, I shot Kirby, as well as a man named John Goolsby, in Chicago. I was later convicted in their deaths. The man I know as 'Head,' whose name is also James Allen, was not present on

the night that Mr. Ciralsky was killed and knew nothing about the armed robbery plan.

85.    Since executing his affidavits, Langford disclosed the following additional information:

    a.  Prior to Kirby's January 31, 1986 murder, Langford was picked up and taken to CPD Area One Headquarters where he was interrogated by Pochordo and Prosecutor A regarding the Ciralsky murder;

    b.  During Langford's Ciralsky interrogation, Pochordo and Prosecutor A wanted Langford to also implicate Plaintiff in Ciralsky's murder;

    c.  During Langford's Ciralsky interrogation, he was told by Pochordo and Prosecutor A that Kirby was the individual that implicated him in the Ciralsky murder and that he killed Kirby as a result of that information provided by Pochordo and Prosecutor A;

    d.  During Langford's Ciralsky interrogation, Pochordo told Langford that he wanted to intentionally frame Plaintiff for the Ciralsky murder as Plaintiff was involved in a 1969 robbery that resulted in the death of a CPD officer; and

    e.  That Prosecutor A traveled to Memphis in March 1986 to question him about Kirby's murder and that Prosecutor A knew that he had murdered Kirby as Prosecutor A and Pochordo were the individuals that revealed to him that Kirby was cooperating with the Ciralsky investigation.

**J.  The Defendant Officers' Pattern of Misconduct and the Defendant, City of Chicago's Policies and Practices Facilitating Such Conduct**

86.    The egregious misconduct of the Police Officer Defendants in this case was not an isolated occurrence. It was undertaken pursuant to, and proximately caused by, the *de facto* policies and practices of the City, acting through the CPD and its officers, which were in place at all relevant times pertaining to this case.

87.    Plaintiff was coerced into giving a false and inculpatory statement pursuant to such municipal policy. The CPD and its detectives and police officers have a long

history of using physically and psychologically coercive interrogation tactics in order to elicit statements from suspects and witnesses in criminal cases, causing hundreds of false confessions and wrongful convictions in the city.

88.     Since 1986, no fewer than 70 cases have come to light in which Chicago police officers have fabricated false evidence and/or have suppressed exculpatory evidence in order to convict innocent persons for serious crimes they did not commit.

89.     These cases include many in which CPD police officers used the same tactics that the Police Officer Defendants employed against Plaintiff in this case, including: (1) using physically and/or psychologically coercive tactics to obtain involuntary and false confessions; (2) fabricating witness statements; (3) concealing exculpatory evidence; (4) manipulating witnesses in order to influence their testimony; and (5) using other tactics to secure the arrest, prosecution, and conviction of a person without probable cause and without regard to the person's actual guilt or innocence.

90.     At all relevant times, the City had a policy and practice of coercing false confessions from those in police custody and using these statements to obtain wrongful convictions. Pursuant to this municipal policy and practice, CPD officers, including the officers at Area One, used interrogation tactics identical or similar to those employed by the Police Officer Defendants in this case to extract confessions. These tactics included: (a) psychological intimidation and manipulation; (b) the use of clearly unreliable or coerced informants and/or witnesses; (c) the fabrication of confessions; (d) the denial of access to counsel; (e) the concealment of exculpatory information; (f) false promises of leniency in exchange for "cooperation" in the form of  false confessions; (g) sleep and

food deprivation; and (h) the use of other unlawful tactics to secure the arrest, prosecution, and conviction of persons without regard to their actual guilt or innocence of the offense.

91.     Also pursuant to municipal policy and practice, members of the CPD, including Police Officer Defendants in this case, systematically suppressed evidence pertaining to the fabricated and coerced confessions obtained in interrogations. This exculpatory information was concealed both from trial attorneys within the Cook County State's Attorney's Office and from criminal defendants and their counsel. In furtherance of this municipal policy and practice, CPD officers, including the Police Officer Defendants in this case, repeatedly and routinely committed perjury while testifying in criminal proceedings in order to conceal their use of coercive interrogation techniques.

92.     The municipal policy and practice described in the paragraphs above was recently described in a Federal Bureau of Investigation FD-302 Report of A Case: Interview with Assistant State's Attorney Terence Johnson. The Report's findings include, *inter alia*, that CPD detectives would feed information to witnesses and coach them through court-reported and handwritten statements, coerce witnesses into sticking to a detective's theory of the case, physically abuse witnesses, and work together to develop and rehearse false narratives so there were no inconsistencies in the witnesses' stories.

93.     At all relevant times, the City also had in place *de facto* policies and practices by which CPD officers, including Police Officer Defendants in this case, were led to believe they could act with impunity, which served to facilitate and further their

- 21 -

misconduct. These policies and practices include: failing to identify and track officers who commit serious acts of misconduct; failing to investigate cases in which CPD officers are implicated in obtaining coerced and false confessions, as well as unfounded charges and wrongful convictions; fabricating identifications and/or withholding exculpatory evidence regarding identifications; failing to meaningfully discipline officers accused of such unlawful conduct; and facilitating a code of silence within the CPD. Pursuant to the City's code of silence, CPD officers were trained and required to lie or remain silent about misconduct committed on the job by their fellow officers.

94.    At all relevant times hereto, members of the CPD, including Defendants in this case, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information in the files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the Cook County State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being maintained as part of the official file.

95.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City, including Defendants in this case, concealed exculpatory evidence from Plaintiff.

96.    The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of

*Fields v. City of Chicago*, 10-CV-1168 (N.D. Ill.), and *Jones v. City of Chicago*, 87-CV-2536, 88-CV-1127 (N.D. Ill.).

97.     The policies and practices of file suppression at issue in *Fields* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the Ciralsky murder and the related investigation.

98.     The City and the CPD routinely failed to investigate cases in which CPD detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his/her misconduct in any of those cases.

99.     Prior to and during the period in which Plaintiff was falsely charged and convicted of the Ciralsky murder, the City operated a dysfunctional disciplinary system for CPD officers accused of serious misconduct. The City's Office of Professional Standards almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago police disciplinary apparatus contained no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

100.    As a matter of both policy and practice, municipal policymakers and department supervisors condoned and facilitated a code of silence within the CPD. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

101.    As a result of the City's established practice of failing to track and identify police officers who are repeatedly accused of the same kinds of serious misconduct,

failing to investigate cases in which the police are implicated in  wrongful charges or convictions, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the CPD, officers (including the Police Officer Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practice of the City, members of the CPD act with impunity when they violate the constitutional and civil rights of citizens.

102.    The City and CPD also failed in the years prior to Plaintiff's wrongful charging and conviction to provide adequate training to CPD detectives and other officers in any of the following areas, among others:

    a.    The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding;

    b.    The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses;

    c.    The risks of wrongful convictions and the steps police officers should take to minimize those risks;

    d.    The risks of engaging in "tunnel vision" during investigation;[6]

    e.    The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report;

---

[6] Tunnel vision refers to a well-researched phenomena wherein officers "focus on a suspect, select and filter the evidence that will 'build a case' for conviction, while ignoring or suppressing evidence that points away from guilt." Dianne L. Martin, *Lessons About Justice from the "Laboratory" of Wrongful Convictions: Tunnel Vision, the Construction of Guilt and Informer Evidence*, 70 UMKC L. REV. 847, 848 (2002).

f.      The absolute prohibition against fabricating evidence and/or testimony in criminal investigations and subsequent prosecutions; and/or

g.      Discouraging use of unreliable informants with known histories and reputations for fabrication and untruthfulness.

103.    The need for police officers to be trained in these areas was and remains obvious. The City's failure to train CPD officers in the areas identified in the preceding paragraph proximately caused Plaintiff's conviction and his injuries.

104.    The City's failure to train, supervise, and discipline its officers, including the Police Officer Defendants in this case, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* policies, as alleged above.

105.    The City and final policymaking officials within the CPD failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the patterns of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

106.    All the policies and practices described in the foregoing paragraphs were knowingly approved by City policymakers, who were deliberately indifferent to the fact that its officers and investigators systematically violated the rights of the people they were sworn to protect.

### K. The Targeted Pattern and Practice of Misconduct Applied Against Plaintiff by Defendant Pochordo

107. While the policies and practices of misconduct described in the foregoing paragraphs were ratified by City policymakers and executed by agents and/or officers of the City against countless innocent individuals, Defendant Pochordo also subjected Plaintiff to that same pattern and practice of misconduct in yet another murder case that Plaintiff did not commit: the murder of Carl Gibson.

108. Plaintiff was not a suspect in the Carl Gibson murder until Defendant Pochordo inserted himself into the investigation despite not being assigned to the case in any way. Defendant Pochordo again enlisted the help of jailhouse snitch, Moore, to seek revenge upon Plaintiff for being a "cop killer," and fed Moore a narrative that would implicate Plaintiff in the Carl Gibson murder.

109. In the Carl Gibson investigation, Defendant Pochordo instructed Moore on how to testify, fed him key facts, and engaged in a bribery scheme to ensure that Moore would testify against Plaintiff.

110. In order to ensure that Moore's testimony would be deemed credible by the judge presiding over the case, Pochordo fabricated an affidavit that states patently false information about Pochordo's relationship with Moore and the history of his dealings with him.

111. Moore later confirmed that the information in Pochordo's sworn affidavit was entirely fabricated.

112. While the affidavit explained that Pochordo had relied on Moore's statements in several other cases, Moore ultimately admitted that the only two cases he ever worked with Defendant Pochordo were the two cases involving Plaintiff James Allen.

113. Moore also admitted that Defendant Pochordo offered consideration for Moore's false testimony, including a plea deal for a time-served sentence on an armed robbery case and cash bribes.

114. In addition to affirmatively arranging false testimony against Plaintiff, Defendant Pochordo also intentionally ignored a confession to the murder by Henry Griffin, which proclaimed the innocence of Plaintiff. Just three days after Griffin's arrest for the Carl Gibson murder, he signed a statement that he shot and killed Carl Gibson without the knowledge of James Allen.

115. The pattern is uncanny. In the *Gibson* case, Defendant Pochordo deployed almost exactly the same tactics as the tactics he used in the *Ciralsky* case, including but not limited to:

    a. As in the *Ciralsky* case, Defendant Pochordo used jailhouse snitch Darryl Moore to provide testimony against Allen in exchange for cash bribes;

    b. As in the *Ciralsky* case, Defendant Pochordo concocted a false affidavit lying about the nature and extent of his relationship with jailhouse snitch Darryl Moore;

    c. As in the *Ciralsky* case, Defendant Pochordo ignored the fact that another individual confessed to the murder while proclaiming Allen's innocence; and

    d. As in the *Ciralsky* case, Defendant Pochordo articulated a desire to target Allen for his perception that Allen was a "cop killer."

116.    These mirror-image tactics of lying under oath, bribery, and witness manipulation in the *Gibson* case, all underlined by the same motive against Allen, paint a picture of the cruel, unconstitutional, and shocking misconduct by Defendant Pochordo.

117.    All the policies and practices described in the foregoing paragraphs were knowingly approved by City policymakers, who were deliberately indifferent to the fact that its officers and investigators, including Defendant Pochordo, systematically violated the rights of the people they were sworn to protect, including Plaintiff in the Carl Gibson murder case.

**L.  *The Pattern and Practice of Pochordo's Misconduct as Evidenced in the Adam Gray Case***

118.    On March 25, 1993, a fire broke out at a two flat apartment building located at 4139 S. Albany Avenue in Chicago, Illinois.

119.    Adam Gray (hereinafter, "Gray") had nothing whatsoever to do with the fire. To the contrary, on the evening of March 24, 1993, Gray slept over at his 13-year-old friend, Mel Gonzalez's (hereinafter, "Mel") house, as witnessed by Mel and her family.

120.    At the time of the fire, Gray was only 14 years old.

121.    CPD police officers interviewed Kasey Paris (hereinafter, "Kasey"), a 13-year-old girl who lived in the first-floor apartment of 4139 S. Albany. Kasey knew Gray. She was angry at Gray because she liked Mel, whom she had dated, and she believed that Gray caused Mel to break up with her. Kasey told CPD officers that she and Adam had not been getting along.

122. CPD officers also interviewed Karrie Kelly (hereinafter, "Kelly"), whose boyfriend lived around the corner from the crime scene. During her first interview, she was under the influence of muscle relaxers and was feeling ill. She told police she saw a teenager running away from the back of the building carrying a white bag. Despite, knowing Gray by name, Kelly did not mention Gray's name in her first interview with police.

123. Ultimately, CPD officers arrested Gray and conducted a coercive, manipulative, grueling and unconscionable interrogation of Gray, which resulted in him making false confession implicating himself in the arson and related murders.

124. At some point after Gray's interrogation, Pochordo met with Kelly to show her a photo lineup to see if she could identify the person she previously mentioned to police. This lineup was not objective or fair in any way. To the contrary, Pochordo utilized unduly suggestive identification techniques and ultimately pressured Kelly to identify Gray in the photo lineup as the teenager fleeing the crime scene with white bag in his hand.

125. In order to bolster the false and coerced confession of Gray as well as the unconstitutional photo identification of Gray by Kelly, Pochordo also fabricated physical evidence. Pochordo procured an empty milk jug, which he and other CPD officers claimed was used by Adam to buy gasoline and carry it from the gas station to the arson scene. Ultimately, and at trial, the prosecution argued that this milk jug was, in fact, the white bag that Kelly saw in Gray's hand.

126.    To further shore up his false charges against Gray, Pochordo went to the Clark gas station at 40th and Kedzie in the early morning hours of March 26, 1993 to meet with Brenda Thomas (hereinafter, "Thomas") Thomas was an attendant at the gas station and had sold gasoline to someone the day before. Pochordo showed Thomas a four-photo array that included Gray's photo.

127.    Pochordo told Thomas to identify the person to whom she had sold gasoline. She told them that she could not identify the person from the photo array because she did not recognize anyone. Pochordo became aggressive and repeatedly told her in an angry tone to "keep looking."

128.    When Thomas was about to pick a photo that was not Gray's photo, Pochordo made it clear to her that she should not pick that photo and that she should pick Gray's photo. Thomas picked Gray's photo not because she recognized him but because Pochordo pressured her to pick his photo.

129.    The photo array, like the one utilized with Kelly, was unduly suggestive, and ultimately, Pochordo again applied pressure to obtain the fabricated evidence he was seeking to pin on Gray.

130.    Thomas made an in-court identification of Gray and testified at trial that she picked out his photo from the photo array.

131.    Adam was ultimately convicted of two counts of arson and murder relating to the March 25, 1993 fire, and sentenced to life without parole. Adam's conviction, in part, rested on antiquated, unreliable, and incorrect expert testimony that the milk jug

found by Pochordo contained a gasoline accelerant consistent with the substances found in the fire debris, and the identifications procured by Pochordo from Kelly and Thomas.

132. In 2006, Thomas recanted her identification of Gray and admitted that she was pressured by Pochordo to select Gray from the array after she initially picked another individual. Pochordo never disclosed the fact that Thomas had initially picked someone else to Gray's lawyers.

133. The milk jug found by Pochordo underwent additional laboratory testing. The analyses revealed that the substance found in the jug differed from substances found in the fire debris, and that no gasoline was found in the milk jug or the fire debris. These findings clearly underscored the fact that Pochordo completely fabricated physical evidence that resulted in Gray's conviction.

134. On May 3, 2017, Adam's conviction was vacated and the case against him was dismissed.

135. In 2018, Gray was awarded a certificate of innocence.

136. The pattern is uncanny. In the Gray case, Pochordo deployed almost the same tactics as those he used in the Ciralsky case, including but not limited to, manipulation of witnesses, coercion and fabricating evidence to prosecute and convict an innocent individual.

137. All the policies and practices described in the foregoing paragraphs were knowingly approved by City policymakers, who were deliberately indifferent to the fact that its officers and investigators, including Pochordo, systematically violated the rights of the people they were sworn to protect, including Gray and Plaintiff.

### M. Plaintiff's Exoneration of the Ciralsky Murder

138.    Throughout his prosecution, and before and during his incarceration, Plaintiff continued to maintain his innocence and pursued all possible legal avenues to prove it.

139.    On February 1, 2019, Plaintiff filed an Amended Petition for Post-Conviction Relief in the Circuit Court of Cook County-Criminal Division, which included, *inter alia*, Langford's affidavits as new evidence for consideration. The Petition alleged numerous constitutional violations and made claims of actual innocence.

140.    On September 15, 2021, the Circuit Court of Cook County-Criminal Division found that Plaintiff made a substantial showing for violations of his constitutional rights; that he made a substantial showing of actual innocence based on Langford's affidavit that would probably change the results on retrial; and a substantial showing that his conviction was the result of constitutional due process violations.

141.    On September 15, 2021, Plaintiff's conviction and sentence were reversed and he was granted a new trial.

142.    Based on the court's ruling, the Cook County State's Attorney's Office moved to *nolle prosequi* the charges.

143.    On September 15, 2021, the Circuit Court of County-Criminal Division dismissed the charges against Plaintiff.

## V.    CAUSES OF ACTION

### COUNT I-42 U.S.C. § 1983
### False Confession
### (Fifth and Fourteen Amendments)

144.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

145.    In the manner described more fully above, the Police Officer Defendants, without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another and others, as well as under color of law and within the scope of their employment, forced Plaintiff to make false statements involuntarily and against his will, which incriminated him and which were used against him in criminal proceedings, in violation of his rights secured by the Fifth and Fourteenth Amendments.

146.    In addition, the Police Officer Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another and others, as well as under color of law and within the scope of their employment, used extreme psychological coercion in order to force Plaintiff to incriminate himself falsely and against his will in a crime he had not committed, in violation of his right to due process secured by the Fourteenth Amendment. This misconduct was so severe as to shock the conscience, as it was designed to injure Plaintiff and was not supported by any conceivable governmental interest.

147.    In addition, the Police Officer Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another and others, as well as under color of law and within the

scope of their employment, fabricated a false confession, which was attributed to Plaintiff and used against Plaintiff in his criminal proceedings, in violation of Plaintiff's right to a fair trial protected by the Sixth Amendment and the Fourteenth Amendment.

148.    Specifically, Police Officer Defendants conducted, participated in, encouraged, advised, and ordered an interrogation of Plaintiff using psychological coercion, which overbore Plaintiff's will and resulted in him making involuntary statements implicating himself in the murder of Ciralsky.

149.    The false and incriminating statements were wholly fabricated by the Police Officer Defendants and attributed to Plaintiff.

150.    Those false and incriminating statements were used against Plaintiff, to his detriment, throughout his criminal case. The statements were the primary cause for Plaintiff's prosecution and conviction for the armed robbery and murder of Ciralsky.

151.    The misconduct described in this Count was objectively unreasonable, undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

152.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and severe damages.

153.    The misconduct described in this Count by Police Officer Defendants was undertaken pursuant to the policy and practice of the CPD, in the manner more fully described below in Count IV.

## COUNT II — 42 U.S.C. § 1983
## Deprivation of Liberty without Probable Cause
### (Fourth and Fourteenth Amendments)

154.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

155.    In the manner described more fully above, the Police Officer Defendants, individually, jointly, and in conspiracy with one another, and others, as well as under color of law and within the scope of their employment, used false evidence that they had manufactured in order to accuse Plaintiff of criminal activity and cause the institution and continuation of criminal proceedings against Plaintiff, without probable cause.

156.    In so doing, these Defendants caused Plaintiff to be deprived of his liberty without probable cause, in violation of his rights secured by the Fourth and Fourteenth Amendments.

157.    These Defendants maliciously initiated and continued judicial proceedings against Plaintiff, resulting in injury.

158.    These Defendants chose Plaintiff, in part, as a result of the Plaintiff's race and the Defendants' racism against Plaintiff, a Black man.

159.    The judicial proceedings against Plaintiff were terminated in his favor when the Circuit Court of Cook County-Criminal Division granted the request of the Cook County State's Attorney's Office to dismiss all charges against him arising out of the armed robbery and murder of Ciralsky.

160.    The misconduct described in this Count was objectively unreasonable, undertaken intentionally and in total disregard of the truth and Plaintiff's clear innocence.

161.    As a result of the misconduct of the Defendants described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

162.    The misconduct described in this Count by these Defendants was undertaken pursuant to the policy and practice of the CPD, in the manner more fully described below in Count VI.

**COUNT III — 42 U.S.C. § 1983**
**Due Process**
**(Fourteenth Amendment)**

163.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

164.    As described in detail above, the Police Officer Defendants, while acting individually, jointly, and in conspiracy with one another, and others, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to due process and a fair trial.

165.    In the manner described more fully above, the Police Officer Defendants deliberately withheld exculpatory evidence, including but not limited to the fact that there was another James Allen, aka "Mr. Kirby" who participated in the armed robbery and murder of Ciralsky with Langford and that "Mr. Kirby" identified Langford as the

shooter to CPD, from Plaintiff and from prosecutors, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

166.    The Police Officer Defendants also fabricated and manufactured evidence and solicited false evidence, fabricated police reports falsely implicating Plaintiff in the armed robbery and murder of Ciralsky, obtained Plaintiff's conviction using that false evidence as well as fabricated witness and co-defendant statements and testimony, and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case. In addition, these Police Officer Defendants produced a series of false and fraudulent reports and related documents, which they inserted into their file and presented to state prosecutors and judges. These documents, which were used to show Plaintiff's purported connection to the armed robbery and murder of Ciralsky, contained statements and described events that were wholly fabricated, and that Police Officer Defendants knew to be patently false. These Defendants signed those reports, as investigators, despite their knowledge that the information contained in them was false.

167.    In addition, based upon information and belief, the Police Officer Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

168.    The misconduct of the Police Officer Defendants directly resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to due process and a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution

of Plaintiff could not and would not have been pursued, and there is a reasonable probability that he would not have been convicted.

169.    The misconduct described in this Count was objectively unreasonable, undertaken intentionally and was in part born of the Defendant's racism against Plaintiff and in total disregard of the truth and Plaintiff's clear innocence.

170.    As a result of the misconduct of the Police Officer Defendants described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

171.    The misconduct described in this Count by these Defendants was undertaken pursuant to the policy and practice of the CPD, in the manner more fully described below in Count VI.

### COUNT IV—42 U.S.C. § 1983
### Failure to Intervene

172.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

173.    In the manner described above and during the constitutional violations described herein, one or more of the Police Officer Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

174.    As a result of the Police Officer Defendants' failure to intervene to prevent violations of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as

emotional distress. These Police Officer Defendants had ample, reasonable opportunities to prevent this harm but failed to do so.

175.    The misconduct described in this Count was objectively unreasonable, undertaken intentionally and in total disregard of the truth and Plaintiff's clear innocence.

176.    As a result of the misconduct of the Defendants described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

177.    The misconduct described in this Count by these Defendants was undertaken pursuant to the policy and practice of the CPD, in the manner more fully described below in Count VI.

## COUNT V—42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

178.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

179.    The Police Officer Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby deprived him of his constitutional rights, all as described in the various paragraphs of this Complaint.

180.    In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

181.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

182.    The misconduct described in this Count was objectively unreasonable, undertaken intentionally and in total disregard of the truth and Plaintiff's clear innocence.

183.    As a result of the misconduct of the Defendants described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

184.    The misconduct described in this Count by these Defendants was undertaken pursuant to the policy and practice of the CPD, in the manner more fully described below in Count VI.

## COUNT VI—42 U.S.C. § 1983
### *Monell* Policy and Practice Claim against the Defendant, City of Chicago

185.    Plaintiff incorporates each paragraph of this Complaint as if fully restated herein.

186.    As described more fully herein, the Defendant City of Chicago is liable for the violation of Plaintiff's constitutional rights by virtue of its official policies.

187.  Plaintiff's injuries were caused by the express policies, absence of needed express policies, and widespread practices and customs of the City, as well as by the actions of policymaking officials for the City.

188.  At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto, the City failed to promulgate proper or adequate rules, regulations, policies, or procedures on: the conduct of interrogations and questioning of criminal suspects by officers and agents of the CPD and the City; the collection, documentation, preservation, testing, and disclosure of evidence; the writing of police reports and taking of investigative notes; the obtaining of statements and testimony from witnesses; the maintenance of investigative files and disclosure of those files in criminal proceedings; and meaningfully disciplining officers accused of such unlawful conduct. In addition, or in the alternative, the City failed to train or supervise officers and agents of the CPD and the City on the above topics, as well as the conduct of interrogations and the techniques to be used when questioning criminal suspects and witnesses.  The City declined to implement adequate policies or training in these areas even though the need for such policies and training was obvious, and the failure to do so would lead to violations of constitutional rights. The decision to not implement adequate policies or training in these areas also contributed to the widespread practices described in this Complaint.

189.  The failure to promulgate proper or adequate rules, regulations, policies, procedures and training was committed by officers and agents of the CPD and the City, including the Defendants.

190.     At all times relevant herein, final policymakers for the City and the CPD knew of these problems, allowed them to continue and made decisions not to implement adequate policies, training, supervision or discipline.

191.     The constitutional violations complained of by Plaintiff were a highly predictable consequence of a failure to equip CPD officers with the specific tools—including policies, training, and supervision—to handle the recurring situations of how to address, preserve, and disclose exculpatory evidence; how to conduct interrogations of suspects and interviews with witnesses; how to prepare witnesses for grand jury testimony; and how to generate investigative reports properly and truthfully.

192.     In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City had notice of a widespread practice and custom by officers and agents of the CPD and the City under which individuals suspected of criminal activity, such as Plaintiff, were routinely coerced against their will to involuntarily implicate themselves in crimes that they had not committed. It was common that suspects interrogated in connection with investigations within the jurisdiction of the CPD and the City falsely confessed, under extreme duress and after suffering physical and/or psychological abuse and/or duress, to committing crimes to which they had no connection.

193.     Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City, under which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to one or more of the following: (1)

- 42 -

individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence, including threats of potential death sentences for crimes they did not commit; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

194.    Furthermore, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City had interrelated *de facto* policies, practices, and customs which included: (1) conducting physically, psychologically, or otherwise illegal or improperly coercive interrogations of witnesses, suspects, and arrestees, in order to obtain confessions; (2) manufacturing, fabricating, and/or using improper suggestive tactics to obtain statements from suspects and witnesses; (3) filing false police reports and giving false statements and testimony about these interrogations, confessions, and witness statements; (4) suppressing evidence concerning the circumstances of these interrogations and confessions; (5) pursuing and obtaining prosecutions and incarceration on the basis of confessions obtained during these

interrogations, and otherwise covering up the true nature of the interrogations, confessions, and witness statements; (6) failing to video and/or audio record the interrogation or questioning of suspects, arrestees, and witnesses; (7) failing to properly train, supervise, discipline, transfer, monitor, counsel, and/or otherwise control police officers, particularly those who were repeatedly accused of physically, psychologically, or otherwise illegally or improperly engaging in coercive questioning or interrogation of witnesses, suspects and arrestees; of torture and related physical abuse of suspects; of false arrests, wrongful imprisonments, malicious prosecutions, and wrongful convictions; and/or making false reports and statements; (8) fabricating identifications and/or withholding exculpatory evidence regarding identifications; (9) withholding evidence and fabricating evidence regarding identifications; and (10) the police code of silence, specifically in cases where officers engaged in the violations articulated above, whereby police officers refused to report or otherwise covered up instances of police misconduct, and/or fabricated, suppressed, and/or destroyed evidence of which they were aware, despite their obligation under the law and police regulations to so report. This code of silence has also resulted in police officers either remaining silent or giving false and misleading information and/or testimony during official investigations and grand jury proceedings, in order to protect themselves and/or fellow officers from internal discipline, civil liability, or criminal charges, and perjuring themselves in criminal cases where they and/or their fellow officers have been accused of misconduct.

195.    The interrelated pattern and practices alleged above were or should have been well-known within the CPD, both before and after Plaintiff was interrogated and

wrongfully convicted, as well as by successive mayors, police superintendents, Office of Professional Standards directors, the Chicago City Council, Police Board and other policymaking, command, and supervisory City and police personnel, who participated in the cover-up and/or continuation of the policies and practices for years.

196.    The interrelated policies, practices, customs, and failure to train set forth above, both individually and together, were maintained and implemented with deliberate indifference. They encouraged, *inter alia*, the coercing of statements from suspects, witnesses, and arrestees; the construction and fabrication of confessions, admissions, statements, and other false witness evidence; the suppression and destruction of exculpatory evidence; the intimidation of witnesses; the making of false statements and reports; the giving of false testimony; the fabrication of evidence; the obstruction of justice; and the pursuit and continuation of wrongful convictions and false arrests and imprisonments. The interrelated policies, practices, customs, and failure to train set forth above were, separately and together, a moving force behind the unconstitutional acts and perjury committed by the Police Officer Defendants and their co-conspirators, and the injuries suffered by Plaintiff, including his wrongful conviction and imprisonment.

197.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City had notice of widespread practices by officers and agents of the CPD and the City, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, and/or did not disclose investigative materials to prosecutors

and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated police reports and other false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain and/or preserve evidence and/or destroyed evidence; and/or (5) pursued wrongful convictions through profoundly flawed investigations.

198.     These widespread practices, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of the City directly encouraged and were the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

199.     The above widespread practices and customs, so well settled as to constitute *de facto* policies of the City, were able to exist and thrive, individually and/or together, because policymakers with authority over same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

200.     As a result of the policies and practices of the City and the CPD, numerous individuals have been wrongly convicted of crimes that they did not commit, including Plaintiff.

201.     In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons

with final policymaking authority for the City, or were committed by persons with such final policymaking authority.

202.    Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

**COUNT VII—State Law Claim**
**Intentional Infliction of Emotional Distress**

203.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

204.    The actions, omissions, and conduct of the Police Officer Defendants, acting as investigators and supervisors and as set forth above, were extreme and outrageous.

205.    These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause or in reckless disregard of, the probability that their conduct would cause severe emotional distress to Plaintiff, as is more fully alleged above.

206.    As a result of these Defendants' actions, Plaintiff suffered and continues to suffer emotional distress and other grievous and continuing injuries and damages as set forth above.

**COUNT VIII—State Law Claim**
**Malicious Prosecution**

207.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

208. In the manner described above, the Police Officer Defendants, individually, jointly, or in conspiracy with each other, and others, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and despite the fact that they knew Plaintiff was innocent.

209. In so doing, these Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause.

210. These judicial proceedings were instituted and continued maliciously, and were rooted in the Police Officer Defendants racism against Plaintiff, resulting in injury.

211. The judicial proceedings against Plaintiff were terminated in his favor when the charges against him were dismissed.

212. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

213. As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX — State Law Claim
## Civil Conspiracy

214. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

215. As described more fully in the preceding paragraphs, the Police Officer Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

216. The violations of Illinois law described in this Complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

217. The misconduct described in this Count was objectively unreasonable, undertaken intentionally and in total disregard of the truth and Plaintiff's clear innocence.

218. As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT X—State Law Claim
### Indemnification

219. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

220.    Illinois Code 65 ILCS 5/1-4-5 provides those public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

221.    The Police Officer Defendants were employees of the CPD, an agency of the City of Chicago, who acted within the scope of their employment while committing the misconduct described above.

222.    The City is liable to indemnify any compensatory judgment awarded against the Police Officer Defendants.

## COUNT XI — State Law Claim
## Vicarious Liability

223.    Plaintiff incorporates each paragraph of this Complaint as if fully restate here.

224.    In committing the acts alleged in the preceding paragraphs, the Police Officer Defendants were employees of the City of Chicago, acting at all relevant times within the scope of their employment and under color of law.

225.    Defendant City of Chicago is liable as a principal for all state law torts, as identified in Counts VII, VIII, and IX of this Complaint, committed by its agents.

WHEREFORE, Plaintiff, JAMES ALLEN, respectfully requests that this Court enter judgment in his favor and against Defendants CITY OF CHICAGO, Special Representative of the Estate of Former Chicago Police Detective, MICHAEL POCHORDO, deceased, Special Representative of the Estate of former Chicago Police Detective GEORGE ROTKIVCH, JR, deceased, and Former Chicago Police Sergeant,

JOHN E. TOENINGS, awarding compensatory damages, attorneys' fees and costs against each Defendant, punitive damages against each of the individual Defendants, and any other relief this Court deems just and appropriate.

## VI.    JURY DEMAND

Plaintiff demands trial by jury on all counts of his Complaint pursuant to Federal Rule of Civil Procedure 38(B).

Respectfully submitted,

/s/ Chester L. Cameron, Jr.
An attorney for Plaintiff

Chester L. Cameron, Jr. (Trial Bar)
Samuel R. Carl
Brennan B. Hutson
**MIDWEST INJURY LAWYERS, LLC**
155 N. Wacker Drive, Ste. 4250
Chicago, IL 60606
(312) 786-5881 (telephone)
(773) 595-4716 (facsimile)
ccameron@midwestinjurylawyers.com
scarl@midwestinjurylawyers.com
bhutson@midwestinjurylawyers.com

Jon F. Erickson (Trial Bar)
223 W. Jackson Blvd., Ste. 612
Chicago, IL 60606
(888) 505-1924 (telephone)
(773) 409-5827 (facsimile)
jon@eolawus.com

Samuel E. Adam, Jr.
**SAM ADAM, JR. LAW GROUP**
223 W. Jackson Blvd., Suite 612
Chicago, IL 60606
(312) 726-2326 (telephone)
attysamadamjr@yahoo.com